**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RICHARD STORLIE, individually, and as Guardian Ad Litem of KATIE STORLIE, a Minor,

Plaintiffs,

vs.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

Defendant.

Case No.: 2:09-cv-02205-GMN-PAL

**ORDER**

Pending before the Court is Defendant State Farm Mutual Automobile Insurance Company's ("Defendant") Motion for Summary Judgment against Plaintiff Richard Storlie (ECF No. 34). For the reasons that follow, Defendant's motion is GRANTED in part and DENIED in part. The motion is granted as to the refusal to pay insurance benefits claim and the Unfair Claims Practices Act claims arising under sections 686A.310(1)(b); (l); and (n). It is denied as to the remaining claims.

## I. Background

On December 26, 2008, the vehicle containing Plaintiff Richard Storlie, his wife, and three daughters was rear ended by a Ford F-150 truck operated by Brad Dyer. Dyer was uninsured and filed for bankruptcy after he defaulted in the civil action the Storlies brought against him, thus preventing the Storlies from recovering against him.

At the time of the traffic collision, Plaintiff had an automobile insurance policy issued by Defendant. The policy provided uninsured/underinsured ("UM") motorist coverage with policy limits of $100,000 per person/$300,000 per accident. Defendant

received notice of the accident on or about the date of the occurrence. (Reply 8:11–12, ECF No. 71.) Then, on December 31, 2008, Plaintiff and his family retained his current counsel to negotiate his claims arising out of the accident. On or about January 12, 2009, Defendant received a letter of representation from Plaintiff's counsel in which Plaintiff's counsel indicated that Plaintiff had "potential UIM/UM and med pay claims arising from bodily injuries sustained in [the] accident." (Ex. 2, Resp., ECF No. 61.) Then, on or about January 13, 2009, Defendant received Plaintiff's emergency room medical records wherein it was noted that Plaintiff complained, *inter alia*, of cervical pain. On or about January 21, 2009, Defendant also received medical records from Plaintiff's primary care physician concerning the physician's preliminary diagnosis of Plaintiff and noting that Plaintiff reported a preexisting cervical injury and surgical repair from 2004.

On May 8, 2009, Plaintiff's counsel sent a letter to Defendant in which a request was made "for a settlement offer under the UIM claim at this time." (Ex. 5, Resp., ECF No. 61.) The letter went further to state "[i]f we do not receive an offer within ten days, we will assume that you are not interested in negotiating a settlement in this case and we will file suit." (*Id.*) Attached to the letter was a medical cost summary, which indicated that Plaintiff had accrued $9,661.81 in medical expenses due to the traffic collision. (*Id.*) However, two of the medical service providers listed--Desert Radiologists and William Muir, M.D.--had no cost amount associated with their entries. (*Id.*) Rather, their "Cost" lines merely read "to be supplemented." (*Id.*)

On May 22, 2009, Defendant noted internally that they did not have a value to substantiate a policy limit payout at that time. (Ex. 6, Resp., ECF No. 61.) On the same day, Defendant sent a letter to Plaintiff's counsel indicating that Defendant would "hold off extending an offer with respect to UM coverage until our file is complete." (Ex. 7, Resp., ECF No. 61.) Further, Defendant requested that Plaintiff forward "any

recommendations regarding a future treatment plan for our insured from his providers" because it would "greatly help us in properly evaluating this claim for U [sic] benefits." (*Id.*) Defendant also included medical authorization forms "in order to stay proactive in requesting any missing records, bills or recommendations from the health providers," but noted that those specific forms did not necessarily have to be returned to Defendant, as long as Defendant received from Plaintiff "written authorization for [Defendant] to obtain medical bills, records and any other information we deem necessary to substantiate the claim." (*Id.*) Defendant had previously sent these medical authorization forms to Plaintiff on January 21, 2009. (*See* Ex. B SF00407–08, Mot. Summ. J., ECF No. 34.)

On June 15, 2009, Plaintiff's counsel responded to Defendant's request for authorization to obtain medical records by indicating that "[a]s a general rule, we advise our clients not to sign general releases." (Ex. 8, Resp., ECF No. 61.) Plaintiff's counsel then noted "[t]he following document is a list of medical providers who treated our client, Plaintiff Storlie, for injuries sustained in a motor vehicle accident occurring on December 26, 2008. Mr. Storlie will execute releases for those providers on the condition that you draft releases for each specific provider." (*Id.*)

Subsequently, on June 22, 2009, Plaintiff's counsel sent Defendant a one-page letter from Dr. William Muir to Plaintiff's counsel, in which Dr. Muir noted that Plaintiff was a candidate for a surgery that would cost $45,000 and, in a conclusory manner, indicated that "[t]he surgical cost is directly related to the accident on 12/26/08." (Ex. B SF00862, Mot. Summ. J., ECF No. 34.) At that time, Plaintiff's counsel requested in writing that Defendant settle for the policy limit of $100,000 and explained that "[s]everal of Mr. Storlie's medical providers have turned his accounts over to collection agencies." (Ex. B SF00861, Mot. Summ. J., ECF No. 34.) Defendant did not pay the

policy limit, but, rather, renewed its request that Plaintiff sign a general release for medical information. Plaintiff agreed to sign such a release in July.

On July 17, 2009, Plaintiff's counsel orally requested that Defendant advance to Plaintiff the undisputed value of Plaintiff's past medical costs so that Plaintiff could pay his outstanding medical bills. (Ex. 12, Resp., ECF No. 61.) Defendant did not make such an advance, and one of its employees noted in its internal computer system that "[i]n similar circumstances, reputable firms should be able to arrange NI to obtain necessary TX on a lien basis, therefore, it does not appear reasonable to provide advance settlement." (*Id.*)

On September 1, 2009, Plaintiff's counsel sent Defendant a letter requesting a status update on Plaintiff's claim and noting that it appeared as though Defendant had contacted the University of Nevada Las Vegas Human Resources Department for Plaintiff's wage loss information. (Ex. 15, Resp., ECF No. 61.) Plaintiff's counsel also inquired as to whether Defendant had received the medical records from Plaintiff's 2004 cervical surgery. (*Id.*) Then, on September 4, 2009, Defendant requested Plaintiff's prior surgical records from MeritCare in Minnesota. (Ex. 16, Resp., ECF No. 61.) MeritCare completed those records on September 14, 2009. (Ex. 17, Resp., ECF No. 61.) Then, on October 13, 2009, Defendant sent a letter to Dr. Muir requesting more information on Plaintiff's diagnosis and recommended treatment, noting that "[p]ast medical records indicate Mr. Storlie has had documented C4-5 disc abnormality dating back to April 2005, and prior cervical spine treatment including discectomy at C6-7." (Ex. 18, Resp., ECF No. 18.) Plaintiff filed this lawsuit on the same day.

Although the case was initially filed in state court, it was removed to this District on November 18, 2009. Once it was removed, Magistrate Judge Leen entered a Discovery Plan and Scheduling Order that established a May 24, 2010 discovery cutoff

date, a March 24, 2010 deadline for disclosing experts, and an April 23, 2010 deadline for disclosing rebuttal experts. Magistrate Judge Leen later approved a joint stipulation extending the discovery cutoff until August 22, 2010, and making the deadline for disclosing experts June 22, 2010 and the deadline for disclosing rebuttal experts July 22, 2010.

In June of 2010, Defendant requested that Plaintiff submit to an independent medical examination pursuant to a clause in Plaintiff's insurance policy that allegedly requires insured parties to submit to such a test. Plaintiff refused to submit to the IME, contending that it was untimely and that the insurance policy had been materially breached by Defendant long before June of 2010.

## II. Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is proper if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). Because summary judgment allows a court to dispose of factually unsupported claims, the court construes the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazari*, 84 F.3d 1194, 1197 (9th Cir. 1996).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Id.* As to

materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered. *Id.* Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but, rather, is an integral part of the federal rules. *Id.*

## III. Discussion

### A. Breach of Contract

In his Amended Complaint, Plaintiff asserts a claim for breach of contract. (Am. Compl., Ex. C, ECF No. 36.) Defendant contends that Plaintiff's failure to submit to an independent medical examination ("IME") when Defendant first requested one in June of 2010 constituted a failure to satisfy a condition precedent of the insurance policy and therefore should bar Plaintiff from recovering benefits under the policy. In support of this proposition, Defendant cites to an assortment of decisions from jurisdictions outside of Nevada that are not binding on this Court. (*See* Mot. Summ. J. 8:11–18, ECF No. 34.) Although Defendant does not refer to it, a relevant case was actually decided in this District: *Schwartz v. State Farm Mutual Automobile Insurance Co.*, No. 2:07-cv-00060-KJD-LRL, 2009 WL 2197370 (D. Nev. July 23, 2009).

In *Schwartz*, Judge Kent J. Dawson addressed a lawsuit wherein the insured party had been asked by State Farm to submit to an IME during its investigation of her injuries; had refused; and then immediately thereafter had filed suit. Among other reasons, Judge Dawson held against the insured party after the conclusion of the bench trial because "Plaintiff's failure to submit to an IME as requested by State Farm violates certain conditions of coverage under the policy" and "Nevada law clearly enforces coverage

conditions, and precludes coverage irrespective of whether there is any prejudice to the carrier." *Id.* at *7. Notably, the IME provision at issue in *Schwartz* was nearly identical to the provision at issue here. In *Schwartz*, the relevant section of the policy explained that the insured must "be examined by physicians chosen and paid by us as often as we reasonably may require." *Id.* at *4.

In this case, the relevant section of the policy requires Plaintiff to:

> **"be examined as reasonably often as *we* may require by physicians chosen and paid by *us*,"**

(Ex. A, Mot. Summ. J., ECF No. 34) (bold typeface added). The only differences are the inclusion of italics in Plaintiff's policy, the change in the location of the prepositional phrase, and the fact that "reasonably" now modifies "often" instead of "may require."

The interpretation of contractual language--such as the provision requiring submission to an IME--is generally treated as a matter of law. *See Cariaga v. Local No. 1184 Laborers Int'l Union of N. Am.*, 154 F.3d 1072, 1074 (9th Cir. 1998); *Musser v. Bank of America*, 964 P.2d 51, 52 (Nev. 1998). When, however, the language is ambiguous and contrary inferences about the underlying intent are possible, an issue of material fact exists for the trier of fact to resolve. *See IBEW v. Southern Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir. 1989); *Casarotto v. Mortensen*, 663 P.2d 352, 353 (Nev. 1983).

Here, the Court finds the contractual provision concerning submission to an IME to be ambiguous and will refrain from attempting to divine its meaning until arguments have been presented at trial. In particular, the use of the words "reasonably often" is unclear and subject to varied inferences. One might infer, as Defendant would like, that the requirement to submit to an IME "reasonably often" means that the insured must submit to an IME at virtually any time the insurance company requests it, even if that

time is near the conclusion of the discovery period and nearly a year and a half after the insured initiated his claim. On the other hand, one might infer, as Plaintiff might like, that this "reasonably often" requirement was only intended to oblige the insured to submit to an IME within a far shorter period after the initiation of a claim.

It was a far simpler matter for Judge Dawson to conclude that the insured had violated the reasonableness aspects of the IME policy provision when the insured failed to submit to an IME prior to filing suit; it is far less clear that the IME provision is violated, however, when the insurer waited and failed to request an IME until nearly the end of the extended discovery period--approximately eight months after formal litigation was commenced and fifteen months after Defendant was put on notice that Plaintiff would be seeking benefits under the UM policy. Because this provision is not self-explanatory and is reasonably susceptible to more than one interpretation, summary judgment is not appropriate. *See Margrave v. Dermody Properties, Inc.*, 878 P.2d 291, 293 (Nev. 1994).

Further, the manner in which "often" is used in this provision is confusing and ambiguous. The adverb "often" generally describes repeated activity that has occurred many times or frequently.[1] As such, it usually connotes an ongoing pattern, rather than an isolated occurrence. Therefore, the IME provision in Plaintiff's policy could most likely be read as providing that Plaintiff must submit to an IME "on whatever reasonable, regular, and repeated basis *we* may require by physicians chosen and paid by *us*," which might be a useful provision to include in a life insurance policy, but would not be as helpful to Defendant's position in this case where Defendant is only seeking a single, isolated examination before trial.

---

[1] For examples of this usage, see the *Oxford English Dictionary*'s illustrative examples of the primary usage of "often," the most modern of which are "You cook it often, and you cook it well" and "He often worried about the neighbors." *Oxford English Dictionary* (2d ed. 1989; online version Nov. 2010).

Alternatively, the word "often" could be read in a slightly different, more colloquial light to be limited by the word "reasonable" as requiring Plaintiff to submit to an IME "on as reasonably many occasions as *we* may require by physicians chosen and paid by *us*." The word "reasonably" could also be interpreted to impose a requirement of timeliness upon the request. However, because the provision is ambiguous, the Court will not rule on its meaning now--it will allow the parties to present arguments and evidence at trial before doing so. As this prevents the Court from reaching the issue of whether the IME provision was breached without excuse in this case, summary judgment cannot be granted as to Plaintiff's breach of contract claim.

B. Bad Faith

In his Amended Complaint, Plaintiff also asserts a claim for breach of the implied covenant of good faith and fair dealing. (*See* Am. Compl., Ex. C, ECF No. 36.) As the Nevada Supreme Court has explained, "[i]t is well settled in Nevada that every contract imposes upon the contracting parties the duty of good faith and fair dealing." *Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 956 (Nev. 1998) (internal quotation marks omitted). Further, the relationship of an insured party to the insurer is one of special confidence: a consumer purchases insurance for security, protection, and peace of mind. *Id.* "While an insured assumes various duties under an insurance contract--such as the timely payment of premiums--the insurer assumes the concomitant duty to negotiate with its insureds in good faith and to deal with them fairly." *Id.*

In Nevada, such a claim for breach of the implied covenant of good faith and fair dealing is treated as a claim for common law bad faith. *Tracey v. American Family Mutual Ins. Co.*, No. 2:09-cv-01257-GMN-PAL, 2010 WL 3613875 (D. Nev. Sept. 8, 2010). To establish a prima facie case of bad faith refusal to pay an insurance claim, a plaintiff must show that the insurer had no reasonable basis for disputing coverage, and

that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage. *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998).

A court in this District has already examined a bad faith claim arising under circumstances similar to those in this case. In *Brandau v. American Family Mut. Ins. Co.*, No. 2:05-cv-00048-KJD-PAL, 2006 WL 1663557 (D. Nev. June 14, 2006), the plaintiff reported the traffic collision to his insurer the day after it occurred and began receiving medical treatment for his injuries, but a great deal of pain persisted, so he decided to investigate surgical treatment. *Id.* at *1. The plaintiff consulted with an orthopedic surgeon, who recommended surgery. *Id.* For six months Plaintiff delayed signing medical authorizations for the insurer and filed his lawsuit less than three months afterwards.[2] As of the time the plaintiff filed his lawsuit, the surgery had not yet been completed. *Id.*

Judge Dawson ultimately entered summary judgment on the plaintiff's bad faith claims, finding that the plaintiff had failed to raise a genuine issue of material fact supporting plaintiff's allegation that the insurer had no reasonable basis for disputing coverage and that defendant knew or recklessly disregarded the fact that it had no reasonable basis for disputing the claim. *Id.* at 2. In reaching this conclusion, Judge Dawson noted that the plaintiff's only evidence in support of his claim for the policy limit was a short letter from an orthopedic surgeon claiming that the plaintiff was a suitable candidate for back surgery with a total cost of $159,000. *Id.* Judge Dawson also

---

[2] During the time plaintiff in *Brandau* was undergoing medical treatment and even afterward, the plaintiff's insurer sent several requests to the plaintiff asking him to provide medical authorization so that the insurer could access his medical records. *Id.* Six months later, the plaintiff faxed the medical authorization to the insurer, and then, less than two weeks later, the plaintiff submitted a demand for the UM policy limit of $100,000. *Id.* One month later, the insurer replied to the plaintiff's demand by requesting more information from him and asking him to sign another medical authorization. *Id.* The insurer subsequently sent requests for the plaintiff's medical records to his medical providers one week later. *Id.* Then, four weeks later, when the insurer had still not made a final decision as to the plaintiff's claim, the plaintiff filed a lawsuit alleging breach of contract, unfair claims practices, and bad faith. *Id.*

explained that, under Nev. Rev. Stat. § 686A.310, Nevada law provides for an insurance company to conduct an investigation before paying the policy limit. *Id.*

At first glance, *Brandau* seems controlling here. As in *Brandau*, Richard Storlie's policy limit claim was based in large part upon a conclusory, one-page surgical recommendation and the insurance company delayed resolution of the UM claim to allow for further investigation into its merits. However, this case is factually distinguishable from *Brandau*. Whereas there is no mention in *Brandau* of the insured requesting the undisputed portion of his UM claim prior to settlement of the entire claim, such a request was expressly made here by Plaintiff's attorney, (*see* Ex. 12, Resp., ECF No. 61).

Although Defendant is certainly correct that there is no case law in Nevada indicating that an insurer must advance the undisputed portion of an UM policy, Plaintiff has produced language from Defendant's internal Auto Claim Manual and admissions from their adjuster's deposition that are relevant to the determination of the reasonableness of Defendant's conduct. Plaintiff asserts and Defendant does not contest that there was an undisputed portion of the claim based almost entirely, if not entirely, on special damages arising from medical treatment. Language in the Manual suggests that, in some limited situations, Defendant does instruct its employees to advance the undisputed portions of an insured's UM policy benefits prior to the final settlement of an insured's claim. (Ex. 13 STOR 0054PRD, ECF No. 62.)[3] By pointing to that provision in Defendant's Manual, Plaintiff casts doubt on whether Defendant's failure to advance Plaintiff the undisputed aspects of his claim was, in fact, reasonable.

Defendant asserts that this provision in the Manual does not apply because its investigation was not yet complete and the parties had not yet reached a negotiation

[3] The parties have stipulated, (*see* ECF No. 20), that the contents of the Auto Claim Manual are confidential; therefore, the specific language of the Manual is omitted.

impasse. As an example of when that particular language in the Manual applies, Defendant points to their payment of the undisputed portion of Ms. Katie Storie's bills after reaching a negotiation impasse with her, and contends that the same circumstances did not exist in the case of Mr. Storlie. However, the impasse language in the Manual only applies to general damages, not special damages, so it does not serve to rebut Plaintiff's point.

Furthermore, Defendant's adjuster, Brandon Lindley, admitted at his deposition that there was nothing that prevented him from making a payment to Plaintiff for the past medical care he had received. (*See* Ex. 18, Resp., ECF No. 61.) This admission by Mr. Lindley that he could have paid for Plaintiff's past medical expenses when Plaintiff requested them, combined with the Manual language directing that payment, could be sufficient to allow a reasonable trier of fact to conclude that Defendant acted unreasonably and knew that it was acting unreasonably, particularly in light of the fact that Plaintiff had put Defendant on notice that some of his medical bills were being sent to a collections agency.

At the very least, the evidence presented by the Plaintiff does raise a material question of fact sufficient to allow the claim to survive a motion for summary judgment. Mr. Storlie has established a prima facie case of bad faith refusal to pay an insurance claim by showing that the insurer had no reasonable basis for denying coverage for the undisputed amount, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage for the undisputed amount. Accordingly, summary judgment will not be granted as to this claim.

C. <u>Violations of Unfair Claims Practices Act ("UCPA")</u>

Plaintiff also asserts in his Amended Complaint a violation of Nevada's statutory Unfair Claims Practices Act ("UCPA"). (*See* Am. Compl., Ex. C, ECF No. 36.) As both

parties acknowledge, claims arising under Nevada's common law bad faith standard constitute a separate cause of action from claims arising out of violations of Nevada's UCPA statute. Under the UCPA, a defendant will be held liable for any damages sustained by a plaintiff as a result of the commission of any act set forth in the statute as an unfair practice. Nev. Rev. Stat. § 686A.310(2). Although it is unclear from the Amended Complaint exactly which provisions of the UCPA Defendant is alleged to have violated[4], the Court will address those sections briefed by the parties.

1. Section (1)(b)

Plaintiff first contends that Defendant violated section (1)(b) of Nev. Rev. Stat. § 686A.310, which is applicable if Defendant failed to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. Plaintiff has not pointed to any instances in which Defendant actually failed to acknowledge a communication with respect to claims arising under Plaintiff's insurance policy *and* failed to act reasonably promptly upon such communications, as is required for a violation to be present. In fact, Plaintiff never notes that Defendant failed to acknowledge a communication concerning claims arising under Plaintiff's insurance policy. Accordingly, summary judgment is appropriate as to section (1)(b) of the UCPA.

2. Section (1)(e)

Plaintiff also alleges that Defendant violated section (1)(e) of Nev. Rev. Stat. § 686A.310 in that it failed to effectuate prompt, fair, and equitable settlements of claims in which liability of the insurer had become reasonably clear. In this case, Defendant's liability to Plaintiff for benefits under the UM policy was reasonably clear up until the June 2010 IME request: Plaintiff had an insurance policy with Defendant that contained

---

[4] Indeed, Plaintiff's third claim for relief–titled "Violation of Nevada Insurance Trade Practices"–seems to be alleging "tortious interference with contract," (*see* Am. Compl. 9:7–8, Ex. C, ECF No. 36), not violations of the UCPA.

an UM provision and Plaintiff's vehicle was struck by an UM which caused him damages. It was just the dollar value of the damages, not liability, that was in dispute. In such circumstances, Section 686A.310(1)(e) mandates that the insurer effectuate prompt, fair, and equitable settlement of the insured's claims.

In this case, a reasonable trier of fact could conclude that Defendant's failure to tender any offer during the ten month span of time between when Defendant initially received notice that Plaintiff might be pursuing an UM cause of action and the time at which Plaintiff filed this lawsuit --January to October--demonstrated a failure on Defendant's part to effectuate the sort of prompt, fair, and equitable settlement contemplated in Unfair Claims Practices Act, particularly when coupled with Defendant's failure to pay the undisputed portion of Plaintiff's medical bills even after receiving notification that they had been sold to a collections agency.

Although Defendant contends in its Reply that this claim fails as a matter of law because Plaintiff failed to produce any admissible evidence of damages, (*see* Reply 13:12–15, ECF No. 71), the Court will not consider that argument at this time, as Defendant did not raise this issue in its motion and therefore Plaintiff was not put on notice that he had to address it in his Response. *See Zamani v. Carnes*, 491 F.3d 990, 991 (9th Cir. 2007) (indicating that "[t]he district court need not consider arguments raised for the first time in a reply brief"). Accordingly, summary judgment will be denied as to this section of the UCPA.

3. Section (1)(l)

Plaintiff further argues that section (1)(l) of Nev. Rev. Stat. § 686A.310 was violated by Defendant. Section 686A.310(1)(l) makes it a violation of the UCPA for an insurance company to fail to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence

settlements under other portions of the insurance policy coverage. Summary judgment will be entered as to this claim because Plaintiff has not identified more than one portion of the policy coverage at issue nor provided any facts suggesting that Defendant failed to settle a claim under one portion of the insurance policy coverage in order to influence settlements under another portion of the policy. Indeed, Plaintiff has not indicated that it is seeking settlement with Defendant under any portion of the insurance policy other than the UM provision, nor has Plaintiff demonstrated that the disputed and undisputed portions of the claim are to be considered two distinct portions of the policy coverage for purposes of UCPA's section (1)(l) .

4. Section (1)(n)

The only other section of the UCPA that Plaintiff, in his Response, asserts was violated by Defendant is section (1)(n). Plaintiff argues that Defendant violated section (1)(n) of Nev. Rev. Stat. § 686A.310 because Defendant failed to provide promptly to an insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable law, for the denial of the claim or for an offer to settle or compromise the claim. However, it is undisputed that Defendant never actually denied the claim or made an offer to settle or compromise it. Rather, Defendant repeatedly indicated that it was not yet prepared to settle the claim with Plaintiff. Accordingly, there are no questions of material fact that would support a claim under this section, and summary judgment can be entered.

D. Refusal to Pay Insurance Benefits

Plaintiff also asserts a claim entitled "refusal to pay insurance benefits." The Court agrees with Defendant that there is no independent cause of action under Nevada or federal law for refusal to pay insurance benefits. (*See* Mot. Summ. J. 7:13–15, ECF No. 34.) Plaintiff does not dispute this in his Response to the Motion for Summary Judgment; therefore, summary judgment will be entered as to this claim.

E. Punitive Damages

Under Nevada law, in order to recover punitive damages a plaintiff must show by clear and convincing evidence that the defendant acted with oppression, fraud, or malice. *Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co.*, 863 F. Supp. 1237, 1250 (D. Nev. 1994). Oppression is a conscious disregard for the rights of others constituting cruel and unjust hardship. *Id.* Malice is present in conduct that is intended to injure a person or despicable conduct that is engaged in with a conscious disregard of the rights and safety of others. *Fries v. State Farm Mut. Auto. Ins. Co.*, No. 3:08-cv-00559-LRH-VPC, 2010 WL 653757, at *4 (D. Nev. Feb. 22, 2010) (citing Nev. Rev. Stat. § 42.005(1)).

Plaintiff has raised a genuine and material issue of fact by arguing Defendant's delay in resolving Plaintiff's claims demonstrated malice, particularly because over $9,000 of the policy was not in dispute and Plaintiff's medical bills had been submitted to collections. In light of the language in the Auto Claims Manual indicating that clearly-defined special damages can be paid prior to settlement negotiations and Brandon Lindley's acknowledgement that there was nothing stopping him from providing Plaintiff with advance payments, this Court finds that a reasonable trier of fact could indeed determine that Defendant's actions and inactions were malicious or oppressive. Defendant's actions look particularly arbitrary and callous in light of the fact that Defendant was on notice that some of Plaintiff's bills were being submitted to a collections agency. Thus, summary judgment will be denied as to Plaintiff's request for punitive damages.

///

///

///

///

## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment Against Richard Storlie (ECF No. 34) is DENIED in part and GRANTED in part. Defendant's Motion for Summary Judgment is granted as to:

1) the portions of Mr. Storlie's third claim for relief--Violation of Nevada Insurance Trade Practices--arising under sections 686A.310(1)(b); (l); and (n); and
2) Mr. Storlie's fourth claim for relief--Refusal to Pay Insurance Benefits.

Defendant's Motion for Summary Judgment is denied as to:

1) Mr. Storlie's first claim for relief--Breach of Contract;
2) Mr. Storlie's second claim for relief--Breach of the Implied Covenant of Good Faith and Fair Dealing;
3) the portion of Mr. Storlie's third claim for relief--Violation of Nevada Insurance Trade Practices--arising under section (1)(e) of Nev. Rev. Stat. § 686A.310; and
4) Mr. Storlie's request for Punitive Damages.

DATED this 13th day of January, 2011.

Gloria M. Navarro
United States District Judge